**SCHIMMEL FUR COMPANY, Inc., a Corporation, Plaintiff-Respondent,**

v.

**AMERICAN INDEMNITY COMPANY, a Corporation, Anthony Charles Vanier Harden, Defendants-Appellants,**

and

**General Insurors, Inc., a Corporation, and Lee Kling, Defendants.**

No. 53796.

Supreme Court of Missouri, Division No. 1.

April 14, 1969.

Rehearing Denied May 12, 1969.

Merle L. Silverstein, Edward P. McSweeney, Rosenblum & Goldenhersh, Clayton, for respondent.

Robert C. Ely, St. Louis, David L. Campbell, Clayton, for appellants.

HIGGINS, Commissioner.

Action in equity for reformation of written endorsements to insurance policy issued by American Indemnity Company and Lloyds of London (through agent Charles Vanier Harden) to provide $22,500 coverage by each company. Over defendants' contention that their liability was limited to $2,500 each, the court found the issues for, and entered judgment as prayed by, plaintiff. The amount in dispute is thus in excess of $15,000.

Plaintiff's cause of action for reformation is stated in its Count I: that on and after September 7, 1962, plaintiff was engaged as a merchant in furs and on and before September 16, 1963, had contracts of insurance in force whereby defendants, American Indemnity Company and Lloyds of London, each insured plaintiff against certain losses in that policy No. BOS 16678, issued by American for policy period March 29, 1962, to March 29, 1965, insured and indemnified plaintiff against loss to $30,000 of merchandise by burglary on premises at 1103 Washington Avenue, St. Louis, Missouri, and policy or certificate No. UL 2477, issued by Lloyds for policy period March 29, 1962, to March 29, 1965, insured and indemnified plaintiff against the same losses to the same amount as de-

scribed in American's policy No. BOS 16678; that in 1963 plaintiff planned to, and did, open a second place of business at 8143 Maryland, Clayton, Missouri, consisting of retail sales area in the front of, and two storage rooms in the rear of, the premises; that plaintiff asked defendant Lee Kling to order and arrange for insurance to protect the new premises against loss by burglary, Lee Kling, through defendant General Insurors, Inc., having procured and sold plaintiff the insurance policies on the 1103 Washington Avenue premises; that just prior to September 16, 1963, plaintiff's officers, on behalf of plaintiff, met with Kling at 8143 Maryland with respect to the insurance of those premises and Kling advised that the desired protection "could and should be effected by an endorsement and addition to the existing policies" covering 1103 Washington Avenue; that it was mutually agreed between plaintiff "and defendants Lee Kling and General Insurors, Inc. on behalf of defendants American Indemnity and Lloyds of London * * * That the existing American Indemnity Company policy No. BOS 16678 would be amended and endorsed to cover the new premises at 8143 Maryland Avenue, insuring plaintiff against any loss of merchandise through burglary from said premises, in the maximum amount of $22,500.00 for any loss from either of the two rooms in the rear of the premises, and in the maximum amount of $2,500.00 for any loss from anywhere else on said premises outside of said rooms, and that in all other respects the terms of the original policy should apply. * * * That Lloyds of London policy No. UL2477 would be amended and endorsed in accordance with the amendment and endorsement of the American Indemnity policy * * * effective as of September 16, 1963. * * * That in negotiating and agreeing to the amendment and endorsement to the aforesaid policies, defendant Lee Kling and defendant General Insurors, Inc. were acting as the agents of * * * Defendant American Indemnity Company and Defendant Lloyds of London. * * * That during the ne-

gotiations for procuring said additional insurance, plaintiff's officers made it clear that, in regard to the two rooms to the rear of the store, the larger room, known by plaintiff as the 'vault,' was to be used primarily for the storage of customers' garments which were insured under another policy (I.N.A.), and the smaller room, known as the 'stockroom,' was to be used primarily to store the merchandise and stock owned by plaintiff, and that it was the smaller room for which the high limit burglary insurance was primarily desired"; that a physical inspection was made of the premises on behalf of the insurers, after which plaintiff was advised to install a certain type of burglary alarm, and "plaintiff was subsequently advised by Lee Kling that plaintiff was appropriately covered by burglary insurance in accordance with their previous mutual agreement and understanding"; that sometime between October and December, 1963, after the insurance coverage had commenced on the Maryland Avenue premises and after plaintiff had commenced business there, American prepared its formal endorsements to policy No. BOS 16678, and through mistake or misadvertence did not correctly describe the part of the premises to be covered by the larger or higher limit in that "said endorsement provided that the $22,500.00 burglary insurance limit should apply to the 'stockroom,' but set forth the physical dimensions and physical description of the larger room in the rear of the premises, known as the vault; * * * this description, * * * prepared long after the insurance coverage had commenced, was mistaken and erroneous, in the (sic) plaintiff and American Indemnity Company had mutually agreed, through their respective agents, that the $22,500.00 limit should apply to both rooms in the rear of the premises and particularly to the smaller room, known by plaintiff as the stockroom"; that the mistake and error was not discovered until October, 1964, when plaintiff sustained a substantial loss by burglary of its stockroom, "the smaller of the two rooms at the rear of the Maryland premises",

that "American Indemnity Company attempted and is attempting to claim that the limit of liability for loss from this smaller room is only $2,500.00"; that the ultimate written endorsement prepared by American and adopted by Lloyds did not express the true intent and mutual agreement of the parties "as to the specific premises at 8143 Maryland upon which the higher limit of insurance was to apply" and "long before said written endorsement was prepared and issued, an expressed oral agreement and contract was in existence and effect, in accordance with the mutual intentions of the parties"; that plaintiff has no adequate remedy at law, and the court should reform the written endorsement to policy No. BOS 16678 so that it properly reflects "the mutual intentions and agreements of the parties by providing that the $22,500.00 insurance limit shall apply to both rooms in the rear of the premises at 8143 Maryland and particularly to the smaller of said rooms known and used as a stockroom for plaintiff's inventory."

The answers of appellants American and Lloyds admitted the issuance of "a policy of insurance, with endorsements, to plaintiff covering certain possible losses of property on premises of plaintiff" and denied "each and every other allegation contained in Count I of plaintiff's petition."

Plaintiff adduced evidence in support of its petition and to show that: American issued the policy in question, BOS 16678, to respondent February 1, 1962. The first page which contained the declarations had affixed to it a printed seal bearing the legend:

> "General Insurors, Inc.
> 4144 Lindell Boulevard
> Olive 2–2000    St. Louis 8, Mo.
> Lee Kling"

At the bottom of the first page, over a line designated "Authorized Representative," appeared the stamp "General Insurors Inc." The last paragraph of the policy recited: "In witness whereof, the American In-demnity Company has caused this policy to be signed by its president and a secretary at Galveston, Texas, and countersigned on the declarations page by a duly authorized representative of the company." Endorsement No. 2, dated March 29, 1962, provided "* * * nor shall this endorsement bind the company until countersigned by a duly authorized representative of the company." This provision is followed by a line designated "Authorized Representative" over which is stamped "General Insurors Inc." The same provisions and designations are true also of Endorsement No. 1, also dated March 29, 1962.

Policy BOS 16678 was in effect in 1963 when Morris J. Schimmel contacted his insurance man, Lee Kling. Schimmel then had one place of business in downtown St. Louis at 1103 Washington which included a vault in the basement for storage of customers' furs and an upstairs stockroom for Schimmel's new merchandise. Endorsement No. 1 provided for high coverage ($27,500) for both these "storerooms," and for $2,500 coverage for loss outside such stockrooms. Schimmel planned to open a second store at 8143 Maryland Avenue in Clayton, and met with Kling prior to September 30, 1963, the date business was commenced in Clayton. Morris Schimmel told Kling he needed $45,000 coverage at the Clayton store on new merchandise which would be stored in a "stockroom" at the rear of the store. Customers' garments would be stored in a "storage vault" to the rear of the stockroom and also at the rear of the premises. The arrangement and intended use of rooms in the Clayton store were explained to Mr. Kling, and inspectors who came to the premises on behalf of the insurers were told how respondent intended to use the premises.

Mr. Kling, at the time he was on respondent's Clayton premises, was a vice-president of General Insurors, Inc. Mr. Schimmel had known and dealt with Mr. Kling for years, and knew of his position with General when arrangements were made for insuring furs at the Clayton store. For

ten years Kling had written all of respondent's insurance through General. "Mr. Kling was my agent and I only would say that, as a vice president of General Insurors, I don't know why I would have to look to anyone else."

At the time of the conference between Kling and Schimmel with respect to insurance for the Clayton store, Schimmel Fur had several policies. The first was BOS 16678 which insured furs owned only by Schimmel at the downtown store. A second policy, in I.N.A., covered customers' furs stored with Schimmel. Mr. Kling acknowledged that Mr. Schimmel wanted coverage for the Clayton location "the same or similar to what he had downtown, except we had different limits to apply." Mr. Kling felt that the Clayton coverage should be accomplished by endorsement of the existing policies "which is the general practice in the business." Mr. Kling, using a General Insuror's form, "requested that this second location be endorsed * * * and, in addition, I may have discussed it with the underwriters (General)." Later, he confirmed to Mr. Schimmel that "the insurance would be in force when he opened." The written endorsement was not issued until "quite a while" later. The premiums for the new coverage were billed by General and paid by Schimmel before the endorsement was issued. It was Mr. Kling's intention in having General order the endorsement from American to effect coverage for furs owned by Schimmel by endorsement to the American and Lloyds policy, and to effect coverage on customers' furs by endorsement to the I.N.A. policy. Mr. Kling and Mr. Schimmel agreed and understood that Mr. Schimmel wanted the high coverage on respondent's merchandise in both storerooms at the Clayton store.

Mr. Kling had been shown both rooms and there was no discussion relative limiting high coverage to one room; however, Endorsement 5 purported to limit the higher coverage to one room, and "this is not what I (Kling) would have intended to order."

Andy Lankford, St. Louis manager for American, received a call from Walter Carlson of General Insurors on September 16, 1963. Mr. Carlson requested an extension of the existing policy issued by American and Lloyds to Schimmel, No. BOS 16678, to include the Clayton store and provide it with the same coverage provided for the downtown store except for different limits. Mr. Lankford talked by telephone to American's home office in Galveston, Texas, and then called Mr. Carlson to tell him American would bind the new risk as of that day. No written binder was issued. Mr. Lankford identified an inspection report of September 17, 1963, prepared for American by Atwell, Vogel & Sterling, Inc., and received by him. The report and accompanying plat described and showed both the storage room and the vault on the Clayton premises.

Mr. Lankford acknowledged the stamp "General Insurors Inc." was placed on the policy, No. BOS 16678, as "authorized representative" with full authority of American.

Appellants emphasize other evidence which came from respondent's case during direct and cross-examination of its witnesses:

Respondent was aware that the larger (vault) of the two storerooms in the Clayton store had superior alarm protection to the smaller (stockroom).

Lee Kling was also a president of Lindell Underwriters, a corporation which he owned. He was an insurance broker and had acted as respondent's broker. He handled respondent's disputes with, and claims against, insurance companies. Respondent depended on Kling to place its insurance business and gave no directions relative placement.

American's agency contract with General provided, among other things, that the agent was appointed "for the purpose of procuring applications for * * * insurance policies."

American's endorsement to policy No. BOS 16678 limited the $22,500 coverage to the larger or vault room and the rest of the premises to $2,500. Mr. Schimmel checked the endorsement to note provision for the total limits requested; he did not learn that only the vault room was described for $22,500 coverage. The burglary which gave rise to this suit was of the smaller stock or storeroom. Both types of storage area were designated "stockroom" in the original policy in its coverage of the downtown store.

According to Mr. Lankford, American would not have issued coverage on a room protected only in the manner the stockroom was protected.

Appellants also introduced an abandoned pleading of respondent that "when plaintiff ultimately received a copy of the written endorsement in December, 1963, plaintiff erroneously and mistakenly believed the description therein to be that of the smaller room (plaintiff's stockroom), which was the room plaintiff primarily desired to be insured for the larger limits."

Upon this evidence the court found the issues generally for plaintiff, and found that the endorsement issued by American to Schimmel "erroneously, through mutual mistake, limits the $22,500 policy coverage to a single 'stock room' in the premises at 8143 Maryland Avenue, Clayton, Missouri, which room is described as being '18 feet by 21 feet and 10 feet in height'" and that the endorsement should be and is "reformed to reflect the mutual intention of the parties * * *: '2. The limit of the company's liability for loss from two rooms in the rear of the premises at 8143 Maryland Avenue, which rooms are used as either stockrooms or vaults for the storage of furs and fur garments, shall not exceed $22,500. The limit of the company's liability for loss outside such rooms shall not exceed $2,500 * * *.'" The judgment was made final for purposes of appeal. Section 512.020, V.A.M.S.

Appellants contend that "Mr. Lee Kling participated in the procuring of plaintiff's burglary insurance coverage with defendants American and Lloyds as an insurance broker and, as such, was the agent of the insured and he had no authority to bind said defendants by altering the terms or conditions of the policy issued, and any mistake made or notice received by him in connection with plaintiff's application for insurance is not imputable to said defendants and the Court erred in holding to the contrary." In support of their contention, appellants cite a number of authorities, e. g., Edwards v. Home Ins. Co., 100 Mo. App. 695, 73 S.W. 881, to show that under the contract between General Insurors, Inc., and American Indemnity Company, General was a broker and an agent of American for the purpose of procuring applications for insurance policies; Gaines v. Berkshire Life Ins. Co., 228 Mo.App. 319, 68 S.W.2d 905, and Corder v. Morgan Roofing Co., 355 Mo. 127, 195 S.W.2d 441, to show that Walter Carlson at General Insurors, Inc., was a general agent of American because he had authority to sign, countersign, or issue policies for American; Section 375.012, V.A.M.S. defining "broker," to show that Mr. Kling was an insurance broker as opposed to a licensed agent of American; Buck v. Stuyvesant Ins. Co. of City of New York, 209 Mo.App. 302, 237 S.W. 840; H & H Mfg. Co. v. Cimarron Ins. Co., Mo.App., 302 S.W.2d 39; Travelers Indemnity Co. v. National Indemnity Co., 8 Cir., 292 F.2d 214; Wolf v. Hartford Fire Ins. Co., 219 Mo.App. 307, 269 S.W. 701, and Farrar v. Mayabb, Mo.App., 326 S.W.2d 337, to show that an insurance broker is generally the agent of the insured; and Bennett v. Royal Union Mut. Life Ins. Co., Mo.App., 112 S.W.2d 134, and Clemments v. German Ins. Co., W.D.Mo., 153 F. 237, dealing with limitations on an agent's authority. From these authorities, appellants argue that the relationship between the parties was that General Insurors, Inc., was limited to soliciting policies on behalf of American; that Andy Lankford was American's St. Louis

office manager; that Walter Carlson was American's licensed agent in Missouri; that Lee Kling was a licensed insurance broker and not a licensed agent of American; and that, consequently, appellants could not be liable to respondent.

There is no quarrel with appellants' authorities, and appellants' theory of relationship between the various persons and parties may be generally accurate. However, those authorities are not decisive of the actual situation which arises from the detailed evidence surrounding the transaction in issue in this case.

■■■ Whether a broker is the agent of the insurer or of the insured depends on the facts of the particular case. The broker may be the agent of just one, or he may be the agent of the insurer for a certain purpose and of the insured for another purpose. Buck v. Stuyvesant Ins. Co., supra, 237 S.W. 1. c. 841[2], and see American Fire & Indemnity Co. v. Lancaster, D.C.E.D.Mo., 286 F.Supp. 1011, 1014[2, 3]. Even though a broker is generally the agent of the one for whom insurance is procured, it has also been recognized that special conditions or circumstances in a particular case may warrant a fair inference that the broker is the agent of the insurer. H & H Mfg. Co. v. Cimarron Ins. Co., supra, 302 S.W.2d 1. c. 43[3, 4].

■■■ The evidence shows that this is not a case where an independent broker is given an order to procure insurance in any company he may choose. Instead, there is evidence from which it could be found that, irrespective of any previous brokerage performed by Kling for plaintiff, an arrangement was made on this occasion between plaintiff and Lee Kling as vice-president of General Insurors, Inc., that an existing policy of insurance, American and Lloyd's No. BOS 16678, should be extended to include plaintiff's new store, and the arrangement was confirmed when Kling notified plaintiff that the new store when opened would be covered as desired by plaintiff. That Kling, as vice-president of General Insurors, was American's actual or apparent agent at the time of the confirmation, is supported on the record: The existing policy had been in effect for over a year and it bore the stamp, "General Insurors, Inc.," as authorized representative of American with knowledge and authority of American; Lee Kling was known by plaintiff to be a vice-president of General Insurors, Inc., and all previous Schimmel insurance had been placed by Kling through General. These circumstances reasonably permitted plaintiff to assume that Kling had authority when he recommended extending the existing policy and called to confirm plaintiff's desired coverage would be accomplished in that manner; and a principal who places an agent in such a situation that a person of ordinary prudence is justified in presuming that the agent has authority to perform a particular act on the principal's behalf is estopped from denying such authority as against such innocent third person. State ex rel. Massman v. Bland, 355 Mo. 17, 194 S.W.2d 42, 46[4, 5]. As noted by the trial court, the original policy, BOS 16678, designating General Insurors, Inc., as authorized representative, constituted some evidence of the apparent authority of General to represent American. Similarly, the printed seal of General affixed to the policy and bearing the name of Lee Kling was evidence of his authority because it is undisputed that he was a vice-president of General during these dealings.

■■■ This evidence, considered with all the evidence, warranted a finding that General and Kling acted as either actual or apparent agents for American with respect to the binder and endorsement of plaintiff's policy in American to provide plaintiff's desired coverage for its Clayton store; and when a written instrument, here the endorsement, does not incorporate the true prior intention of the parties, a mutual mistake exists entitling either to a reformation. Ethridge v. Perryman, Mo., 363 S.W.2d 696, 698[1]; Edwards v. Zahner, Mo., 395 S.W.2d 185, 189[1].

There was evidence from which it could be found that American, through General and Kling, and plaintiff, through Morris Schimmel, mutually agreed to an expansion of an existing policy by endorsement to provide high coverage on plaintiff's merchandise in either of the two storerooms at the rear of plaintiff's Clayton store. Plaintiff's desire for such coverage was embodied in an order form by Kling which he transmitted to General. American's resident agent at General, Walter Carlson, called Andy Lankford, American's St. Louis manager, who called American's home office in Galveston, Texas. This chain was then reversed with Lankford calling Carlson to tell him American would bind the desired risk, and thereafter Kling advised plaintiff of the oral binder of the desired coverage. Plaintiff was billed and it paid for the desired coverage. The written endorsement, however, failed to provide high coverage on plaintiff's merchandise in both Clayton storerooms as provided at the downtown store and, in limiting high coverage to one room, the endorsement failed to provide what plaintiff wanted and appellants said it was getting. It thus failed to express the agreement of the parties, through mutual mistake, and the endorsement was, therefore, a proper subject for reformation to conform to the parties' agreement. Ethridge v. Perryman, supra.

Appellants refer to evidence concerning required burglar alarms and comparative security of the two rooms at the Clayton store to support an argument that high coverage never would have been written for both rooms. This is without merit when considered with the evidence that their own inspection report revealed these conditions and no effort was made to cancel or limit the insurance which had already become bound through the conversations of September 16, 1963.

Appellants also argue that the mistake was unilateral on the part of Schimmel and for that reason no ground for reformation existed. See Leimkuehler v. Shoemaker, Mo., 329 S.W.2d 726, Allan v. Allan, Mo., 364 S.W.2d 578; and Herhalser v. Herhalser, Mo.App., 401 S.W.2d 187. They attempt to support this argument with Minich v. MFA Mut. Ins. Co., Mo.App., 325 S.W.2d 56, and Kap-Pel Fabrics, Inc. v. R. B. Jones & Sons, Inc., Mo.App., 402 S.W.2d 49, to effect that an application for insurance is merely an offer, which may be accepted or rejected by the company, and the sending of a different policy than that applied for constitutes a counteroffer.

This argument is without merit in this case because it is the insuring agreement accomplished by requested extension of existing insurance and the oral binder of that coverage upon which this action is based. The binder was not a counteroffer but was an acceptance of a desired risk, and the subsequent written endorsement which failed to embody that existing agreement was a proper subject for reformation.

Appellants contend also that plaintiff is equitably estopped to seek reformation on account of his own negligence and that it is barred from recovery on account of laches.

These matters are affirmative defenses and were not pleaded as required by Civil Rule 55.10, V.A.M.R. and Section 509.090, V.A.M.S. Civil Rule 55.54 provides that where issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated as if they had been raised by the pleadings. Appellants, however, are not entitled to any benefit from the latter rule because there was no express consent to the trial of such issue in this case; they make no suggestion how such consent can be implied from the manner in which this case was tried, and the record does not reveal any such implied consent. The purpose of Civil Rule 55.10, supra, is to give notice to opposing parties in order to be prepared on the issues, Kramer v. Johnson, 361 Mo. 1085, 238 S.W.2d 416, 421[4] (laches), White v. Wilks, Mo., 357 S.W.2d 908, 913 [11–13] (estoppel), and a consent to trial

of affirmative defenses not pleaded should not be implied absent a joinder of issue on such defenses.

The judgment is not shown to be "clearly erroneous," Civil Rule 73.01(d), and, therefore, should not be set aside.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HENLEY, P. J., STORCKMAN, J., and HOLMAN, Alternate J., concur.

SEILER, J., not sitting.